

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-25-2005

# DiPeppe v. Secretary Homeland

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-3443

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"DiPeppe v. Secretary Homeland" (2005). *2005 Decisions.* Paper 783.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/783

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-3443

RITA DIPEPPE,
                              Appellant

v.

TOM RIDGE, SECRETARY OF DEPARTMENT OF HOMELAND
SECURITY; MICHAEL GARCIA, ACTING DIRECTOR, UNITED
STATES IMMIGRATION & CUSTOMS ENFORCEMENT;
JOHN CARBONE, FIELD OFFICE DIRECTOR, NEWARK OFFICE OF
DEPARTMENT OF HOMELAND SECURITY IMMIGRATION
CUSTOMS & ENFORCEMENT (USICE); DEPARTMENT OF
HOMELAND SECURITY

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
D.C. Civil No. 04-cv-02298
District Judge: The Honorable William G. Bassler

Submitted Under Third Circuit LAR 34.1(a)
July 1, 2005

Before: ROTH, RENDELL, and BARRY, Circuit Judges

(Filed: July 25, 2005)

OPINION

BARRY, <u>Circuit Judge</u>

Rita DiPeppe ("DiPeppe") appeals the denial of her second petition for a writ of habeas corpus, contending that the execution of the final order of removal entered against her will cause her to commit suicide, thereby violating her substantive due process rights under the Fifth Amendment. We disagree.

## I. **Background**

DiPeppe is a native and citizen of Italy who has been a lawful permanent resident in this country since 1955. After pleading guilty in 1992 to aggravated manslaughter in the shooting death of her husband,[1] she was sentenced to a term of twenty-seven years in prison with nine years of parole ineligibility. The Immigration and Naturalization Service ("INS")[2] subsequently served DiPeppe with an Order to Show Cause, charging her as a deportable alien based on her conviction for an aggravated felony.[3] <u>Cf.</u> 8 U.S.C. § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after

_____

[1]On November 1, 1991, DiPeppe pulled a gun from her purse and shot and killed her estranged husband. Apparently, DiPeppe had suffered mental and physical abuse at the hands of her husband over the course of their twenty-three-year marriage, and they separated as she became increasingly emotionally unstable.

[2]The INS is now the Bureau of Immigration and Customs Enforcement ("BICE"), and operates within the Department of Homeland Security. <u>See</u> 6 U.S.C. § 271 (2002); <u>see also</u> <u>Ambartsoumian v. Ashcroft</u>, 388 F.3d 85, app. at 95 n.6 (3d Cir. 2004).

[3]The terms "Order to Show Cause" and "deportable" were replaced with "Notice to Appear" and "removable," respectively, by the 1996 passage of the Illegal Immigration Reform and Immigrant Responsibility Act. <u>See</u> <u>DiPeppe v. Quarantillo</u> ("<u>DiPeppe I</u>"), 337 F.3d 326, 330 n.9 (3d Cir. 2003).

2

admission is deportable."). For reasons that are unclear, the Order to Show Cause was never filed with the Immigration Court.[4]

On August 2, 2000, the INS issued, and this time filed, a Notice to Appear, charging DiPeppe with removability as an alien convicted of an aggravated felony. On October 31, 2000, DiPeppe was paroled and taken into INS custody. She sought discretionary relief from removal before the IJ, which was denied on December 18, 2000. On June 8, 2001, the Board of Immigration Appeals ("BIA") affirmed, and on July 5, 2001, DiPeppe filed her first petition for a writ of habeas corpus in the U.S. District Court for the District of New Jersey, seeking relief under two provisions which allow for a discretionary waiver of deportation, §§ 212(c) and 212(h) of the Immigration and Naturalization Act.[5] The District Court denied her application under the former provision, but granted it under the latter and remanded the case, which proceeded to a

---

[4]Under the regulations in place in 1992, it was necessary to file with the Immigration Court to trigger deportation proceedings. See 8 C.F.R. § 242.1(a)-(b) (1992).

[5]When DiPeppe pled guilty in 1992, § 212(c) relief was available to any permanent resident alien who had been lawfully domiciled in the United States for seven consecutive years, as long as that alien had not been convicted of an aggravated felony that caused him or her to serve a prison term of at least five years. See DiPeppe I, 337 F.3d at 328, 330. In 1996, the provision was repealed in its entirety, and was replaced by a new provision that allowed for cancellation of removal, but not if the alien had been convicted of an aggravated felony. See id. at 328-29. Section 212(h) also underwent a change in 1996. Although § 212(h) had previously allowed for a discretionary waiver in the case of an alien convicted of a crime of moral turpitude who could demonstrate that a denial of such a waiver would cause extreme hardship to the alien's citizen spouse, parent, or child, after 1996 it became unavailable for a permanent resident alien who had been convicted of an aggravated felony. See id. at 327-28.

3

hearing before an IJ on the § 212(h) claim at approximately the same time that cross-appeals taken from the District Court's decision were pending before us. Meanwhile, DiPeppe was released on bond.

On April 30, 2002, the IJ found DiPeppe eligible for relief under § 212(h), and granted a waiver and adjustment of status. But on July 18, 2003, we issued our decision on the cross-appeals, concluding that DiPeppe was ineligible for relief under *both* provisions and reinstating the final order of removal, thereby nullifying the effect of the IJ's decision. See DiPeppe v. Quarantillo, 337 F.3d 326, 331-32 (3d Cir. 2003). It does not appear, however, that DiPeppe has been returned to custody.

In the fall of 2003, DiPeppe's adult daughters had her mental health evaluated by a licensed psychologist, Dr. Allan Cooperstein, and a psychiatrist, Dr. Clancy McKenzie. Dr. Cooperstein noted that DiPeppe had been hospitalized twice in 1986 for "depression with suicidal ideations,"and that she had attempted suicide three times while in prison serving her aggravated manslaughter sentence. He diagnosed her with Major Depression[6] and warned that she was "experiencing recurrent thoughts related to a suicidal act." A57.

Dr. McKenzie's evaluation focused on the effect that deportation would have on DiPeppe. He concluded that "[i]t is without doubt that this . . . woman will shift into severe depression once more, will be extremely suicidal, and probably will move back

---

[6]He also found evidence of Post-Traumatic Stress Disorder and Bipolar Personality Disorder.

4

into psychosis." A68. He added that "it is clear that deportation most likely is a death sentence to her," id., a phrase DiPeppe herself had previously used to describe her feelings.

On March 10, 2004, DiPeppe again sought discretionary relief, this time in the form of deferred action. The request was denied, and DiPeppe was instructed to report for removal to Italy on April 12, 2004.[7] As that date approached, DiPeppe's mental state apparently deteriorated to such an extent that, on April 18, 2004, one of her daughters had her committed to Friends Psychiatric Hospital in Philadelphia, Pennsylvania.[8]

DiPeppe was given a new deportation date of May 24, 2004. Instead of reporting for removal, however, on May 18, 2000, she filed her second habeas petition, "alleging that the execution of the removal order would violate her substantive due process rights pursuant to the Fifth Amendment . . . as the execution of the order would likely precipitate a deep psychosis likely resulting in suicide." Br. at 4. The District Court heard oral argument on June 21, 2004, and denied the petition that same day. A stay of removal pending appeal was granted, and DiPeppe thereafter timely filed the appeal now before us.

----

[7]This is the deportation date given in the letter sent to DiPeppe's lawyer from John Carbone, the local Field Office Director for BICE; however, DiPeppe's second habeas petition and the District Court's second habeas opinion both give the date of April 19, 2004.

[8]DiPeppe was an inpatient until April 29, 2004, and then became an outpatient, receiving treatment at the hospital eight hours a day, five days a week. It is unclear whether she is still receiving treatment.

## II. Discussion

This case came to us as an appeal from the District Court's denial of DiPeppe's second application for a writ of habeas corpus. Previously, we would have considered such an appeal under the jurisdictional scheme of 28 U.S.C. §§ 1291 and 2241. But, with the passage of the Real ID Act of 2005, Pub L. No. 109-13, 119 Stat. 231 (May 11, 2005), the nature of our jurisdiction has changed. As we very recently explained in Bonhometre v. Gonzales, No. 04-2037, __ F.3d __, __ (3d Cir. 2005), all aliens are now limited to "one bite of the apple," see id. at __, and we are to consider challenges to a final order of removal that (1) were filed as appeals from a district court's denial of a writ of habeas corpus, and (2) were pending before us when the Real ID Act was enacted, to be petitions for review. See id. at __. Under this scenario, we exercise jurisdiction under 8 U.S.C. § 1252. The scope of our review, however, does not change; we still analyze the alien's legal claims *de novo*. See Bonhometre, __ F.3d at __. Here, it was concluded that "execution of [DiPeppe's] removal does not deprive [DiPeppe] of her substantive due process rights." DiPeppe v. Ridge, No. 04-1954, slip op. at 8 (D.N.J. June 21, 2004). We agree.[9]

---

[9]We make two other points concerning our jurisdiction. First, we note that DiPeppe protests an action the government is only *preparing* to take, and has not yet taken. That fact, however, does not deprive her of standing in this case. See Spencer v. Kemna, 523 U.S. 1, 7 (1998) (explaining that, to have standing, a plaintiff "must have suffered, *or be threatened with*, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." (internal citation omitted) (emphasis added)). Second, because this appeal is now being treated as a petition for review, we do not need to

6

It is clear that the Fifth Amendment's due process protections apply to aliens in removal proceedings. See Reno v. Flores, 507 U.S. 292, 306 (1993). "The touchstone of due process is protection of the individual against arbitrary action of government." County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998) (quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)). Substantive due process therefore limits what the government can do in both its legislative and executive capacities, but the "criteria to identify what is fatally arbitrary differ" depending on which of these capacities the government is acting in when it takes the challenged action. See id. at 846. Where, as here, an individual alleges "abusive executive action . . . only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" See id. (quoting Collins v. Harker Heights, 503 U.S. 115, 129 (1992)).[10]

Thus, the test is whether such an action "shocks the conscience." See id. at 846-47, Collins, 503 U.S. at 128; see also Rochin v. California, 342 U.S. 165, 172-73 (1952) (formulating the shocks-the-conscience test), Benn v. Univ. Health Sys., 371 F.3d 165, 174 (3d Cir. 2004) (framing as the "threshold question" whether the executive action at

---

address DiPeppe's argument that she satisfies the "in custody" requirement of 28 U.S. C. § 2241, for that inquiry is no longer relevant to our exercise of jurisdiction.

[10]When a legislative act is being challenged as a substantive due process violation, courts must determine whether the claim implicates a fundamental right or liberty interest, as defined by our country's history, legal traditions, and practices. See Washington v. Glucksburg, 521 U.S. 702, 710, 719-723 (1997).

issue "shock[s] the contemporary conscience") (citing Lewis, 523 U.S. at 847 n.8).[11] The Supreme Court has recognized that there is a spectrum of executive conduct that, depending on its context, would reach "the point of conscience shocking." See Lewis, 523 U.S. at 849. Conduct that would most likely support a claim under this test is "conduct intended to injure in some way unjustifiable by any government interest." See id.; see also A.M. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 579 (3d Cir. 2004).

DiPeppe has seized upon the word "contemporary" used by the Lewis Court in, and only in, footnote 8 of its opinion to describe whose conscience we should test for shock. See Br. at 18-21; Lewis, 523 U.S. at 847 n.3. As many courts, including ours, have also focused on that adjective, see, e.g., Rivera v. R.I., 402 F.3d 27, 36 (1st Cir. 2005), Terrell v. Larson, 396 F.3d 975, 978 (8th Cir. 2005), Benn, 371 F.3d at 174, we will assume that the Lewis Court intended for it to be incorporated into the test it laid out in the text of its opinion. While DiPeppe lists and discusses, at length, "cases that reflect an evolution of the conduct that a civilized society will not tolerate," Br. at 19, she never ties that supposed evolution to the facts of her case. Instead, she simply states that "there

---

[11]The government points to Chavez v. Martinez, 538 U.S. 760 (2003), as authority on the shocks-the-conscience test, see Br. at 6, 8. Chavez, however, was a plurality opinion, and the portion of Justice Thomas's opinion that the government relies on is not the opinion of the Court on the substantive due process issue. See Chavez, 538 U.S. at 774-77. Instead, Justice Souter wrote that part of the opinion for the Court, and it consisted of one sentence instructing that the case be remanded on that issue. Id. at 779-80.

8

is an increasing need to regulate excessive authority within . . . custodial settings." Id. at 20.

Even accepting that to be true, we cannot see how the government's execution of the final order of removal entered against DiPeppe would shock our conscience, contemporary or otherwise. There is no allegation that officials working for the former INS or the current BICE have interfered with or deprived DiPeppe of psychiatric treatment, nor is there any indication that they are trying to deport DiPeppe with the intent that she commit suicide. Indeed, BICE officials have "located providers in various parts of Italy who are able to offer therapy, medication, monitoring, and other mental health services as needed." A70. They have also confirmed that her condition will not prevent her from traveling. Furthermore, the deportation of criminal aliens is *at least* a justifiable government interest, and BICE's neutral, benign performance of such an act is not conscience-shocking.

There is also a recognized "middle range" of culpability that could ground a substantive due process claim: executive conduct that exhibits deliberate indifference. See Lewis, 523 U.S. at 850. When operating in this range, courts must closely analyze the circumstances surrounding the challenged conduct, as "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another," id., and the Supreme Court "has always been reluctant to expand the concept of substantive due process." Collins, 503 U.S. at 125.

9

In light of this caution, we would have to "definitively calibrate the egregiousness level" required of a claim that execution of a deportation order would trigger the alien's suicide. See Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 401 (3d Cir. 2000). But there is no constitutional right to asylum, see Abdulrahman v. Ashcroft, 330 F.3d 587, 596 (3d Cir. 2003), or to discretionary relief from removal, which is essentially what DiPeppe requests. See, e.g., INS v. Yang, 519 U.S. 26, 30 (1996) ("The Attorney General's suspension of deportation . . . [is] 'an act of grace' which is accorded to [his] 'unfettered discretion.'") (quoting Jay v. Boyd, 351 U.S. 345, 354 (1956)); cf. 8 U.S.C. § 1229b (replacing the suspension of deportation remedy with "cancellation of removal"). Therefore, because "other precedent makes clear that this sort of claim cannot present a substantive due process claim in the first place[,]" we will not attempt to engage in a definitive calibration. See Boyanowski, 215 F.3d at 401. Instead, we simply conclude that, regardless of where on the spectrum of culpable conduct below conscience-shocking the government's threatened action may lie, if it even lies anywhere on that spectrum, there is no infringement of DiPeppe's substantive due process rights.[12]

---

[12]DiPeppe also urges us to consider that "she has lived virtually her entire life in the United States, [her] children have been judicially found to likely suffer extreme hardship if [she] is removed," and "[s]he is fully Americanized in all respects, other than the thin piece of paper termed a 'Certificate of Naturalization.'" Br. at 10, 27. While we are sympathetic to DiPeppe and her family, the emotional pain of deportation is one felt by many aliens facing removal who also must say good-bye to friends, family, and other ties that remain behind in the United States. Thus, the fact that a person who does not have that "thin," but extremely significant, piece of paper will be devastated to leave this country when ordered to do so does not shock the conscience.

10

### III.  <u>Conclusion</u>

For the foregoing reasons, and having recharacterized the appeal as a petition for review in light of the Real ID Act, we will deny the petition for review.